NOTICE: NOT FOR OFFICIAL PUBLICATION.
UNDER ARIZONA RULE OF THE SUPREME COURT 111(c), THIS DECISION IS NOT PRECEDENTIAL
AND MAY BE CITED ONLY AS AUTHORIZED BY RULE.

IN THE

# ARIZONA COURT OF APPEALS
### DIVISION ONE

---

IN RE TERMINATION OF PARENTAL RIGHTS AS TO C.C.

No. 1 CA-JV 24-0091
FILED 01-14-2025

---

Appeal from the Superior Court in Maricopa County
No. JS21423
The Honorable Pamela S. Gates, Judge

**AFFIRMED**

---

COUNSEL

Alongi Law Firm PLLC, Phoenix
By Thomas P. Alongi, Elizabeth Alongi, Sarah Hansen
*Counsel for Appellant*

Robert D. Rosanelli Attorney at Law, Phoenix
By Robert D. Rosanelli
*Counsel for Appellee*

---

**MEMORANDUM DECISION**

Vice Chief Judge Randall M. Howe delivered the decision of the Court, in which Presiding Judge Michael S. Catlett and Judge Jennifer M. Perkins joined.

---

**H O W E**, Judge:

**¶1**        Shayna T. ("Mother") appeals the juvenile court's denial of her petition to terminate David C. ("Father")'s parental rights to their daughter, C.C. We affirm.

## FACTS AND PROCEDURAL BACKGROUND

**¶2**        We view the facts in the light most favorable to upholding the juvenile court's findings. *Brionna J. v. Dep't of Child Safety*, 255 Ariz. 471, 479 ¶ 32 (2023).

**¶3**        Mother and Father, who were never married, were living together when C.C. was born in December 2012. Two years after her birth, Father was arrested for burglary and sentenced to seven-and-a half years in prison. Throughout his incarceration, Mother brought C.C. to visit with him in prison. After his release in October 2020, Father continued to visit C.C. and sent her text messages.

**¶4**        In fall 2021, the parties petitioned to establish child support, parenting time, and legal decision-making. Soon afterwards, Mother sought an order of protection against him, claiming that he attempted to convince C.C. to run away with him and grabbed and yelled at Mother. The family court granted the order for Mother but not C.C.

**¶5**        The family court held a trial on parenting time and legal decision-making in July 2022. In determining the statutory factors, the court did not find credible Mother's order of protection allegations that Father tried to abscond with C.C. or had grabbed Mother. The court entered a parenting plan that allowed him to gradually increase his parenting time with C.C. through five "phases."

**¶6**        Father progressed through the first three phases of the parenting plan, and in March 2023, he had his first overnight parenting time

with C.C. Before he could have a second overnight, however, Mother obtained an ex parte order of protection on behalf of herself and C.C., alleging Father had sent C.C. a message through Facebook telling C.C. to stay off his Facebook page or he would kill her. At a hearing on the order, the court rejected Mother's allegation and dismissed the order.

¶7            In July 2023, the court amended Mother's order of protection to permit Father to contact her about C.C. through a service called OurFamilyWizard. From October to December 2023, Father attempted to communicate with Mother through OurFamilyWizard, but she never registered to use the service.

¶8            The parties were also required to utilize a third party to assist with parenting time exchanges. Mother refused to work with the agency Father had retained, however, because he had selected it without consulting her. When the agency emailed her to arrange for the first visit, she responded that Father was delusional and mentally ill. She also threatened to report the exchange supervisor to the police for harassment and have Father arrested if she emailed again.

¶9            After Father failed to retain an agency, the court selected a second service. In September 2023, Father arranged for this agency to begin supervising parenting time exchanges. He also petitioned the family court to clarify the parenting plan. In October 2023, the court ruled that he was in "phase three" of the parenting plan.

¶10           After receiving this clarification, Father and the exchange supervisor attempted four visits with C.C. in October and November 2023. For the first visit, C.C. came out of the house, said "hi" to Father, and gave him a hug. But she appeared anxious, and he did not force her to visit with him.

¶11           Around the time of the second visit, Mother petitioned to terminate Father's parental rights, alleging abandonment beginning in March 2023. She further alleged that terminating the parent-child relationship was in C.C.'s best interests because the child's stepfather planned on adopting her. She retained a social worker to complete the statutorily required severance social study.

¶12           Two more visits occurred shortly after Mother had petitioned, but C.C. declined to attend. On November 5, 2023, after the four visits concluded, Mother emailed the supervisor threatening to report both her and Father to the police for violating the order of protection she had against Father and for "harassing her." The following day, the agency discontinued

services because of Mother's threats. In February 2024, Father petitioned the family court for mediation. Although the parties attended the mediation, it was brief and unsuccessful.

**¶13** In April 2024, the juvenile court held a trial on Mother's petition. Father, Mother, and the social worker who completed the severance study testified. The social worker opined that Mother interfered with Father's ability to have parenting time with C.C. and that termination of his parental rights was not in C.C.'s best interests.

**¶14** The juvenile court denied the petition, ruling that Mother failed to prove abandonment by clear and convincing evidence. The court found that after the family court "ordered a parenting time schedule that allowed [Father] to increase his time with [C.C.]," Mother "began engaging in conduct to undermine [Father]'s ability to enhance and stabilize his relationship with [C.C.]." The court noted that this finding was based on the evidence and testimony presented during trial and "was reached by other judicial officers who considered [Mother]'s evidence and the factual allegations she asserted against [Father]." The court specifically found that he "did not threaten the child's life and any effort to alarm the child regarding such alleged conduct by [Father] has unnecessarily and unreasonably increased anxiety for the child." The court also found that he "has taken efforts to engage in a parenting relationship with [C.C.], but his efforts have been impeded by [Mother]." Because the court ruled that Mother failed to prove abandonment, it did not determine whether termination would be in C.C.'s best interests.

**¶15** Mother timely appealed and we have jurisdiction under A.R.S. §§ 12-2101(A)(1) and 8-235(A). While her appeal was pending, she moved to set aside the juvenile court's order, and we stayed this matter and remanded for the court to decide the motion. The court denied her motion, and we lifted the stay.

## DISCUSSION

**¶16** Mother argues the juvenile court erred because its order denying her termination petition did not "apply Arizona's abandonment statute and case law to the facts," and the court's findings about Father's efforts to maintain a relationship with C.C. were "not supported by the record."

**¶17** The juvenile court may terminate the parent-child relationship if the moving party proves by clear and convincing evidence at least one of the statutory grounds set forth in A.R.S. § 8-533(B). *Brionna*

*J.*, 255 Ariz. at 474 ¶ 1; A.R.S. § 8-537(B). We accept the court's factual findings so long as reasonable evidence and inferences support them, and we affirm the court's legal conclusions about the statutory grounds for the termination unless they are clearly erroneous. *Brionna J.*, 255 Ariz. at 478–79 ¶¶ 30–31.

**¶18** One statutory ground for termination of parental rights is abandonment. A.R.S. § 8-533(B)(1). Arizona law defines "abandonment" as

> the failure of a parent to provide reasonable support and to maintain regular contact with the child, including providing normal supervision. Abandonment includes a judicial finding that a parent has made only minimal efforts to support and communicate with the child. Failure to maintain a normal parental relationship with the child without just cause for a period of six months constitutes prima facie evidence of abandonment.

A.R.S. § 8-531.1. The juvenile court must assess abandonment objectively based on the parent's conduct, not his or her subjective intent. *See Michael J. v. Ariz. Dep't of Econ. Sec.*, 196 Ariz. 246, 249–50 ¶ 18 (2000). Accordingly, when faced with obstacles to a continuing parental relationship, a parent must "act persistently" to establish or develop the relationship, including by "vigorously assert[ing] his legal rights." *Id.* at 250 ¶ 22 (citation omitted). But "a parent who has persistently and substantially restricted the other parent's interaction with their child may not prove abandonment based on evidence that the other has had only limited involvement with the child." *Calvin B. v. Brittney B.*, 232 Ariz. 292, 293–94 ¶ 1 (App. 2013).

## I. The Court's Legal Analysis

**¶19** Mother first argues the juvenile court's ruling is "empty of legal analysis" related to abandonment. The court, however, expressly cited the abandonment statute, recited the standard of proof, and observed correctly that "[t]he right to have custody and care of one's own child[] is among our most precious liberties[, and t]he ability to permanently deprive a parent of that right is one of the most awesome powers of the state." *See Michael J.*, 196 Ariz. at 253 ¶ 39 (Zlaket, J., concurring in part) (citations omitted). Mother fails to explain how this summary of the law was legally inadequate and her argument therefore is waived. *See J.W. v. Dep't of Child Safety*, 252 Ariz. 184, 188 ¶ 11 (App. 2021) ("Arguments that are unsupported by legal authority and adequate citation to the record are waived.").

## II.     Sufficiency of the Evidence

**¶20**         Mother next argues the court erred by "refus[ing] to apply" the law to the facts. Essentially, she asks us to reweigh the evidence by asserting that her evidence proved Father was indifferent to C.C. for more than the six months required to establish prima facia abandonment under A.R.S. § 8-531(1). We will not reweigh the evidence on appeal. *Jessie D. v. Dep't of Child Safety*, 251 Ariz. 574, 582 ¶ 23 (2021). We will accept the court's findings of fact if reasonable evidence supports them. *Brionna J.*, 255 Ariz. at 478 ¶ 30.

**¶21**         Here, the record contains substantial evidence that Father did not abandon C.C. from May 2023 to February 2024. During this period, he successfully challenged the order of protection Mother had obtained on C.C.'s behalf, participated in a status conference about parenting time exchanges, moved for clarification concerning the status of his parenting time, moved to dismiss her petition to terminate his parental rights, and petitioned for mediation in the family court. He also hired two separate companies to supervise exchanges, attempted four visits with C.C., and tried repeatedly to communicate with Mother through OurFamilyWizard. All the while, he consistently paid child support. Thus, reasonable evidence supports the court's findings that Father did not abandon C.C. *See Brionna J.*, 255 Ariz. at 478 ¶ 30.

## III.    Interference with Parental Rights

**¶22**         Mother further argues the court erred by finding that she impeded Father's efforts to rebuild a parental relationship with C.C. She asserts her behavior "did not remotely approach" the mother's bad conduct in *Calvin B.*. In *Calvin B.*, the mother restricted the father's contact to only minutes at a time despite a dissolution decree calling for "liberal visitation," sought two orders of protection against him, ignored his requests for visits, and contacted police to prevent visits. 232 Ariz. at 294–95, ¶¶ 2–8.

**¶23**         In this case, the record demonstrates that once Father petitioned for parenting time and legal decision-making, Mother began undermining his parental relationship. Father testified that he created an account with OurFamilyWizard and attempted to communicate with her through that program "[m]ultiple times, and she's still yet to log in[.]" Mother argues he presented no evidence that she did not register for OurFamilyWizard, but we will not second guess the court's credibility or weight determination that it gave to Father's testimony. *Ariz. Dep't of Econ. Sec. v. Oscar O.*, 209 Ariz. 332, 334 ¶ 4 (App. 2004).

**¶24** But even if Mother had registered for OurFamilyWizard, she directly prevented Father from seeing C.C. Twice Mother petitioned for orders of protection against Father shortly after he sought or exercised increased parenting time. In both instances, the court rejected her allegations. On three occasions in 2023, Mother also threatened to call police on Father or his exchange supervisors if they continued trying to facilitate parenting time exchanges because she accused them and Father of violating her order of protection. Notably, the social worker who conducted the social study concluded that because of "[t]he barriers created by [Mother], . . . [Father]'s desire to have a healthy relationship with [C.C.] has been a marathon of exhaustive efforts." Thus, Mother's interference with Father's parental rights rises at least to that of the parent in *Calvin B*. We discern no error.

## CONCLUSION

**¶25** We affirm.

